UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
————

JUSTIN SHERODD DOSS,

                Petitioner,              Case No. 1:12-cv-1023

v.                                  Honorable Robert J. Jonker

STEVE RIVARD,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Following a jury trial in the Berrien County Circuit Court in July 2009, Petitioner was found guilty of armed robbery, MICH. COMP. LAWS § 750.529, being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, two counts of possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b, and two counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89.  On September 4, 2009, the trial court sentenced Petitioner as a third habitual offender, MICH. COMP. LAWS § 769.11, to 20 to 50 years' imprisonment for the armed robbery and for each of the assault-with-intent-to-rob-while-armed convictions, 3 years and 7 months to 10 years' imprisonment for the felon-in-possession and carrying-concealed convictions, 2 years' imprisonment for each felony-firearm conviction, and 36 to 96 months' imprisonment for the assault-with-a-dangerous-weapon conviction.    In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.     TRIAL COUNSEL'S ADMITTEDLY NON-STRATEGIC FAILURE TO IMPEACH KEY PROSECUTION WITNESS[ES] WITH PRIOR CONVICTIONS, AND MINIMAL OR NO[N]EXIST[E]NT CROSS-EXAMINATION OF THOSE WITNESSES, DEPRIVED THE PETITIONER OF AN ESSENTIAL ELEMENT OF HIS DEFENSE AND HIS CONSTITUTIONAL [RIGHT] TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

II.    REVERS[I]BLE ERROR OCCURRED WHEN THE PROSECUTOR IMPROPERLY QUESTIONED A PROSECUTION WITNESS ABOUT AN UNCHARGED AND UNSUPPORTED R[]APE: IN THE ALTERNATIVE, [PETITIONER] WAS DENIED HIS . . . RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO HIS TRIAL ATTORNEY'S FAILURE TO OBJECT TO THE PROSECUTOR'S QUESTION.

III.   DEFENDANT [IS] ENTITLED TO RESENTENCING WHERE THE TRIAL COURT ERRONEOUSLY SCORED OFFEN[S]E VARIABLES THREE AND THIRTEEN; DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE SCORING.

(Pet. 3-4, docket #1.)  Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are non-cognizable, procedurally defaulted or have no merit. Upon review and applying the AEDPA standards, I find that grounds one and two are without merit and ground three is a non-cognizable state-law claim.  Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.    Trial Court Proceedings**

The state prosecution arose from the armed robbery of Andrea Cole and the attempted armed robbery of other persons at Cole's Benton Harbor home on February 1, 2009.  Petitioner was charged with armed robbery, assault with intent to rob while armed, being a felon in possession of a firearm, carrying a concealed weapon, interference with a telecommunications device, assault with

a dangerous weapon, and multiple counts of felony firearm.  Following a preliminary examination on February 17, 2009, Petitioner was bound over on all charges.  (Prelim. Exam. Hr'g Tr. at 43-44, docket #9.)  A supplemental information was filed charging Petitioner as a habitual offender, third offense.  Petitioner was tried before a jury beginning July 22, 2009, and concluding on July 24, 2009.[1]

        Andrea Cole testified that, on February 1, 2009, she was living in Benton Harbor, Michigan, at 959 Buss, apartment two, with her boyfriend Anthony Brown (Tez) and his younger brother Keenan.  (Tr. II at 151, 167.)  Cole arrived home that evening at about 8:00 p.m.  She and Anthony were the only ones at the apartment initially, but Keenan came home later.  (*Id.* at 151-52.)  Their friend Chris White arrived at the same time as Keenan.  The four were talking.  (*Id.* at 152.)  Between 9:00 and 10:00 p.m., some other men came to the apartment:  Dominique (Blackwell), Norris Maben (No-No), Demarcus Walker, and Petitioner (Mooda or Moodah).  She did not know Dominique well, and she originally thought he was someone else.  (*Id.* at 153-54, 167.)  Cole had only known Maben for a couple of months, and February 1, 2009 was the second time she had met Petitioner.  (*Id.* at 154.)  She had known Demarcus Walker for some years, as he was her son's cousin.  (*Id.* at 155.)  Sometime after they arrived, Cole went upstairs while the men talked.  She spoke to her cousin on the phone in her bedroom.  While she was on the phone, Petitioner came upstairs and asked her about money.  (*Id.*)  When Petitioner came to her bedroom, it seemed strange, and she thought something was going on.  (*Id.* at 156.)  Petitioner stated, "Keenan said give him his money," as if she were holding money for Keenan.  (*Id.*)  Cole knew that Keenan had won some

---

[1]Transcripts of the trial proceedings hereafter will be designated as follows:
July 22, 2009 (docket #11):  Tr. I at ___;
July 23, 2009 (docket #12):  Tr. II at ___;
July 24, 2009 (docket #13):  Tr. III at ___.

money shooting dice.  At this time, she had one hundred dollars in her purse, but she did not have Keenan's money.  (*Id.*)  Petitioner asked Cole to come downstairs.  She grabbed her purse off the bed, and she told her cousin, to whom she continued to talk, to call the police.  (*Id.* at 157.) Petitioner tried to grab the phone from her.  They struggled over it, and the phone fell, losing its battery.  (*Id.* at 157-58, 165.)  Cole went downstairs with Petitioner.  (*Id.* at 158.)  When she got downstairs, she saw Anthony Brown and Keenan faced toward the back of the couch, and she saw Demarcus Walker pointing a gun at them.  (*Id.* at 159, 180.)  Cole recognized Demarcus Walker, though she knew that he did not really know her.  Cole told Walker that she was his cousin's mother and that it was her house.  (*Id.* at 160-61.)  Chris managed to run out of one of the doors.  Petitioner then grabbed Cole's purse and ran out with Demarcus, Norris Maben and Dominique.  (*Id.* at 161-63.)  Cole went upstairs, got her phone, put the battery back in, and called the police.  (*Id.* at 165.) Later that night, she received several phone calls from Dominique and Norris Maben.  They told her that they had nothing to do with the incident and they did not know what was going to happen.  They promised to get her purse back.  (*Id.* at 166.)  Cole met Norris Maben at his aunt's house the next day, and he returned her purse, with all of its contents.  (*Id.* at 162, 166.)  Cole testified that a large group of people were playing dice at her house the night before the robbery.  (*Id.* at 180.)  Cole was aware that Keenan had won between $1,000.00 and $1,500.00 from their neighbor "Rocky" in the dice game.  (*Id.* at 172-73.)  Rocky was not one of the men who came to Cole's house on the night of the robbery.  (*Id.* at 173.)

Keenan Watkins testified that he was nineteen years old.  On February 1, 2009, he lived with his brother Anthony Brown and Brown's girlfriend Andrea Cole at an apartment on Buss Street.  (*Id.* at 187-88.)  Watkins testified that he used to attend dice games at the Buss Street house,

though he could not recall having one the day before the incident in question.  (*Id.* at 189.)  Watkins testified that he had known Petitioner as "Mooda" since they were in grade school together.  He considered Mooda a good friend.  (*Id.* at 189-91.)  Watkins also testified that he had played dice with Rocky before, though he denied playing with Demarcus Walker.  Watkins grew up with Norris Maben, and he had known Dominique Blackwell for about six years.  (*Id.* at 190.)  Watkins was at home with Anthony Brown and Andrea Cole on February 1, 2009.  (*Id.* at 191.)  Watkins repeatedly testified that he could not recall whether Chris White was there, whether anything happened that night, whether something happened with a gun, or whether he spoke with police, even after reading the police report.  (*Id.* at 192-95, 199-202.)  Yet he remembered that Maben, Blackwell, Walker and Petitioner came to the house and that they might have gotten drunk and smoked some weed or just had fun.  (*Id.* at 194, 201.)  Watkins testified that he went to jail on February 5, 2009.  (*Id.* at 193.)  Watkins claimed that he won a lot of money on dice at least once a month and had no memory of winning $1,000.00 to $1,500.00 the night before February 1, 2009.  (*Id.* at 196-97.)  He claimed to have no memory of the robbery, though he heard about it around February 9.  (*Id.* at 197.)  He denied any memory that someone had come looking for the money.  He acknowledged regularly winning money from Rocky, but he denied knowing that Rocky was Petitioner's friend, despite being good friends with Petitioner.  (*Id.* at 198-99.)  Watkins denied having communicated with Petitioner while in jail, and he claimed not to know if a particular note (People's Proposed Ex. 4) was from Petitioner.  (*Id.* at 202-04.)  Watkins acknowledged that Andrea Cole was pregnant at the time of the robbery, but he denied remembering that Petitioner told Anthony Brown to shut up or that Petitioner hit Brown in the head with a gun.  He denied all of the specific statements he made to Detective Smigielski:  about Petitioner going through Brown's pockets; about where he was

- 5 -

sitting; about his telling Petitioner he had no money; about Petitioner ordering Walker upstairs but Walker came down after going halfway.  (*Id.* at 204-07.)   After many minutes of frustrating testimony, the prosecutor asked,

> Q.   So you would – you're telling us you're not sure if you'd remember if there was [a] gun pulled out in the house and someone raped [sic] your pregnant sister-in-law and held you and your brother at gunpoint on a couch.

(*Id.* at 207.)  Watkins denied all memory of events that evening.  (*Id.*)  He thereafter continued to deny each and every statement made to police for several more minutes.  (*Id.* at 208-212.)  He acknowledged, however, that everyone knew that Norris Maben owned a burgundy IROC Camaro, though he did not remember telling the police that the four robbers ran out of the house and got into the Camaro.  (*Id.* at 209.)  Watkins acknowledged that his name was at the top of a jail letter identified as People's proposed Exhibit 5, which said, "[H]i, my name is Keenan Watkins," but he claimed not to remember having written it.  (*Id.* at 214-15.)  He denied any memory of a letter from Mooda saying that they all should agree not to testify against one another.  (*Id.* at 216.)  He also acknowledged that he was arrested and charged for a robbery that occurred on February 4, 2009, in which Petitioner and Norris Maben were victims or that Petitioner and Maben and were supposed to be witnesses against Watkins.  (*Id.* at 216-17, 220-21.)  Watkins admitted that he used a gun in the robbery on February 4, 2009.  (*Id.* at 219.)  He pleaded guilty under a plea agreement.  (*Id.* at 218.)  He denied that his February 4, 2009 robbery of Petitioner and Maben was done in retaliation for the February 1, 2009 robbery, but he could not recall the circumstances leading up to the February 4, 2009 robbery.  (*Id.* at 220-23.)

The jury was excused and the judge warned Watkins that, based on the testimony he had heard, a strong possibility existed that Watkins could be charged with perjury for his testimony

and that, if he were found guilty, the penalty could be up to life in prison.  (*Id.* at 224-25.)  Watkins nevertheless declined to testify further.  (*Id.* at 225.)

Anthony Brown (Tez or Brown Eye or Cortez) testified that he lived with his girlfriend Andrea Cole and his younger brother Keenan Watkins at the Buss projects.  (*Id.* at 227, 230.)  Brown testified that he knew who Petitioner was, but he did not "hang out" with Petitioner.  (*Id.*)  Brown identified Petitioner, who also was known to him as Little Mooda.  (*Id.* at 228.)  Brown also testified that he and his family had known Norris Maben's family for a long time, and he had known Dominique Blackwell for three or four years.  (*Id.* at 229.)  On the night of February 1, 2009, Anthony Brown, Andrea Cole and Keenan Watkins were all home.  Their friend Chris White came by, and they were all talking.  (*Id.* at 232.)  Awhile later, Maben, Dominique, Petitioner and Walker stopped by.  (*Id.*)  They all sat around and talked for awhile.  (*Id.* at 233.)  Andrea Cole was upstairs during this time.  (*Id.*)  Brown testified that both he and Norris Maben were present when Keenan Watkins had won $1,200.00 or $1,300.00 playing dice the day before.  (*Id.* at 235, 256.)  At some point, Petitioner pulled a gun from his right pocket and told Brown and Watkins to lie down and asked them where the money was.  (*Id.* at 235, 237-38.)  Brown described the gun as a little black revolver.  (*Id.* at 238.)  Petitioner told Brown to lie down and then hit Brown with the gun.  (*Id.* at 234, 240.)  Brown faced the couch, with his knees on the floor, and put his face on the couch bed.  (*Id.* at 238-39.)  Petitioner and Walker talked about money, and Brown assumed they were talking about the money his brother had won.  (*Id.* at 241.)  Petitioner and Walker searched Brown and his brother, and Petitioner tapped Brown's pockets.  Brown and Watkins pulled out their pockets to show that they had no money.  (*Id.* at 242-43, 246.)  Walker also searched Keenan's coat for money.  (*Id.* at 242, 246.)  Petitioner told Walker to go upstairs and "get that bitch."  (*Id.* at 244.)  Walker

started up the stairs, but came back down. (*Id.*) Petitioner handed the gun to Walker, and Walker

put the gun to the back of Brown's head. (*Id.* at 240, 242, 244.) Petitioner went upstairs and came

back down with Cole. (*Id.* at 242.) While Walker was focused on Brown, Chris White ran out the

front door. (*Id.* at 250-51.) When Cole got downstairs, Walker backed up a bit. (*Id.* at 248.) Cole

and Walker talked face-to-face, and Cole told Walker that she knew him. (*Id.* at 248-49.) Shortly

after that, Petitioner took Cole's purse and all the men ran out of the back door of the house, which

led to the parking lot. (*Id.* at 249, 251.) Brown saw all four men get into No-No's car and drive out

of the area. (*Id.* at 251.) During the robbery, No-No kept saying that he had nothing to do with it.

Dominique said nothing. (*Id.* at 252.) Before Cole called the police, Brown left the apartment and

went to his aunt's house. (*Id.* at 252-53.) Brown testified that he really did not want to testify, but

he was under subpoena and did not want to go to jail for refusing. (*Id.* at 253.) According to Brown,

it was not a good thing to testify if you lived in Benton Harbor. (*Id.*) Brown testified that, when he

was in jail and was bunked in the gym, he saw Petitioner. (*Id.* at 254.) On one occasion, while

Brown was in the shower, Petitioner put some snack food on Brown's bunk. (*Id.* at 255.)

       Norris Maben (No-No) testified that he had known Petitioner all his life, and he met

Anthony Brown and Watkins when he was young. He had only known Andrea Cole for a couple

of months. (*Id.* at 250-61.) On February 1, 2009, he went to Brown's house in the Buss project with

Demarcus Walker, Dominique Blackwell (Domino) and Petitioner. They drove to Brown and Cole's

house in Maben's burgundy Camaro. (*Id.* at 262-63.) When they arrived, Brown, Watkins and

Chris White were in the room and Andrea Cole was upstairs. (*Id.* at 263.) The men were talking,

until Keenan Watkins said that he would "whoop" Demarcus Walker. (*Id.*) Maben then stood and

said, "[L]et's go." (*Id.*) Walker pulled out what looked like a .32 caliber handgun and ran out of

the kitchen area toward the couch, telling Brown and Watkins to get on the couch.  (*Id.* at 264-65,

268.)  Walker told Petitioner to search their pockets, and Petitioner patted down Watkins, but Maben

did not believe he found anything.  (*Id.* at 264.)  Walker threw Maben the coat, and Maben put it

back on the couch.  Maben then left the house.  (*Id.*)  Once he was outside, he saw Chris White come

out the back door.  (*Id.* at 270.)  The other men came out, and they all got into Maben's car.  Maben

testified that did not see Petitioner with the purse.  (*Id.* at 264.)  Maben drove away and Petitioner

was in the front passenger seat.  Both Walker and Blackwell were in the back seat.  (*Id.* at 271.)

When they arrived at Maben's aunt's house on Hecht Court, Maben saw Walker with the purse.  (*Id.*

at 264.)  Walker and Petitioner both looked into the purse.  (*Id.* at 273.)  Maben and Petitioner then

left, and Walker went his own way.  (*Id.* at 264.)  He saw Walker throw the purse on the ground as

he walked away.  (*Id.* at 273.)

Maben denied remembering any conversation about money or the purse, either in the

house or in the car.  (*Id.* at 272.)  Maben went back and picked up the purse the next day.  (*Id.* at

275.)  Cole telephoned him, and Maben told Cole that he would bring her purse back.  (*Id.* at 274-

75.)  Cole told Maben that everything was in the purse except $100.00, and Maben promised to pay

Cole the $100.00.  (*Id.* at 275-76.)  He did so because Cole originally believed that Maben had set

her up, and he wanted to show that he had no part in the theft.  (*Id.* at 276.)  Maben stated that he

did not want to testify against Petitioner, but he was under subpoena.  (*Id.* at 277.)  After the

robbery, Maben spoke to Detective Smigielski.  (*Id.* at 277-78.)  He denied, however, telling

Smigielski that Petitioner had gone through the pockets of Brown and Watkins, and he denied that

Petitioner had asked him to help.  (*Id.* at 278.)  Maben also denied that he had talked with Petitioner

about what happened and denied that he was upset with Petitioner for placing him in the situation.

He claimed that, once Cole had her purse and was satisfied, he was not worried about the police. (*Id.* at 281-82.)

Christopher White testified that he had known Anthony Brown and Andrea Cole for about four years and had known Keenan Watkins for about six or seven years. (*Id.* at 293.)  White visited Brown most days. (*Id.* at 294.)  White also had known Petitioner since junior high school, and he hung out with him frequently. (*Id.* at 294.)  On the night of February 1, 2009, White arrived at about midnight.  They all were smoking a marijuana blunt. (*Id.* at 295-96.)  At some point, Blackwell, Maben, Walker and Petitioner came over. (*Id.* at 296.)  All of the men were smoking and sitting, and Andrea Cole was upstairs. (*Id.* at 297.)  All of a sudden, Petitioner had a small revolver, possibly a .22 caliber gun. (*Id.* at 298-99.)  People were talking about dice and money, and White heard Walker say, "Just give up the money . . . ." (*Id.* at 301, 303, 305.)  He saw Petitioner tap White in the head with the gun. (*Id.* at 309.)  White emptied his pockets, in response to the gun being pointed at him and at others. (*Id.* at 299-300.)  He had nothing in his pockets. (*Id.* at 300.)  White saw no money come from anyone. (*Id.* at 303-04.)  Petitioner gave the gun to Walker and went upstairs. (*Id.* at 300, 324-25.)  White fled. (*Id.* at 300, 304.)  He spoke with Detective Smigielski on July 17, 2009, when Smigielski came to deliver a subpoena. (*Id.* at 305-06.)  White stated that he could not recall much of what he told Smigielski. (*Id.* at 306-07.)  He acknowledged, however, that he told Smigielski that Petitioner had asked if there was anyone else in the house and where the money was. (*Id.* at 308.)  White denied seeing Cole come downstairs with Doss. (*Id.*)  White acknowledged that he did not want to testify and was doing so in response to a subpoena. (*Id.* at 311.)  When he was last in jail, he received a couple of jail letters (kites) through a jail trustee on separate occasions.  A guard found the letters and took them. (*Id.*)  White identified People's

- 10 -

Proposed Exhibits 2 and 3 as the letters sent to him by Petitioner.  (*Id.* at 312-313.)  He knew who

the letters were from because he had been talking with Petitioner at the jail and because the letters

had Petitioner's name on them.  (*Id.* at 313-14)  White declined to read Exhibit 2, asking the

prosecutor to do so.  (*Id.* at 314-15.)  The prosecutor read out the following text:

> Q.  What's up, Chris bitch?  I talked to that bitch Keenan, he said to tell you you
> are going to be subpoenaed to trial.  But all I need you to say is I never had
> a gun, I never took a purse.  Walker had a gun to everybody and the boy with
> five star on his hands had took her purse and we all was running out the back
> door, but it was not [Petitioner] who took her purse, it was the boy with the
> five star on his hand.  That was with Walker and Walker had the gun.  You
> just say that, good looking, when you get out, I got you ho.  Let's get this
> down packed.  From Little Mooda. . . .

(*Id.* at 315.)  After the content was read, the court quickly excused the jury and ordered everyone

else to remain in the courtroom, because someone in the court room called out "snitch" while White

was testifying.  (*Id.* at 316-17.)  The court ordered that the men who were responsible be removed

from the courtroom and be banned.  The court also instructed those remaining in the courtroom that

any further outburst would result in someone being sent to jail.  (*Id.* at 237.)  The court instructed

the jury to disregard anything they might have heard from the observers.  (*Id.* at 318.)  Once the jury

returned, White testified that the letter referred to his being subpoenaed to court.  (*Id.* at 318.)  He

denied knowing what the last part of the letter meant.  (*Id.* at 319.)  The prosecutor read out the

second letter, Exhibit 3:

> Q.  . . . I talked to that nigger Keenan and he said you was going to be
> subpoenaed to my trial court date, but all I need is for you to say is that
> Walker pulled out a gun.  Then the nigger with a five point star on his hand
> took her purse, but the other boy looked similar to [Petitioner].  It wasn't
> [Petitioner].  Neither did [Petitioner] take the purse.  I saw who had the gun
> on us and who took the purse.  And flush this when you get through, but
> remember this . . . ."

(*Id.* at 319-20.)   White admitted that the prosecutor had read the second letter correctly.   He eventually admitted that Petitioner was instructing him to flush the letter down the toilet.   (*Id.* at 320.)   White acknowledged that he did not contact the police, did not want to be involved, and was only present in court because he was on a tether at the time he testified.   (*Id.* at 321.)

Benton Harbor Police Officer Benjamin Eberly testified that he was dispatched to 959 Buss Street on February 1, 2009 at 10:17 p.m., on a report of a robbery in progress involving four male suspects who had left in a burgundy IROC Camaro.   Eberly arrived about two minutes later and found Andrea Cole outside, talking on the phone and distraught.   She began screaming that she had been robbed, that her purse was gone, and that the suspects had departed in a burgundy car.   (*Id.* at 326-27.)   Eberly issued a BOL (be on the lookout) for the Camaro.   The car was located a couple of hours later a few blocks from Hecht Court.   After issuing the BOL, Eberly interviewed Andrea Cole.   (*Id.* at 328.)   She gave him the names of four men, including Demarcus Walker.   Anthony Brown was not at the residence when Eberly interviewed Cole, but Eberly talked to Brown at about 3:00 a.m. the next morning.   (*Id.* at 330-31.)   Eberly testified that he was unable to locate any of the men Cole identified that evening.   However, Demarcus Walker called the police on February 3, 2009, advising that he wanted to talk with them.   (*Id.* at 329.)   The investigation subsequently was turned over to Detective Smigielski of the detective bureau, but Eberly joined Smigielski in the interview of Walker when Walker came into the police department.   (*Id.* at 329-30.)

Rodney Walters testified that he was lodged in the Berrien County Jail in April of 2009.   (*Id.* at 332-33.)   He had known Petitioner from the street, and he was with Petitioner in the jail.   (*Id.* at 333-34.)   Walters received a number of jail letters or kites while in jail, including some from Petitioner, despite the fact that kites are not supposed to circulate in the jail.   (*Id.* at 333-34.)

Walters testified that he kept some of Petitioner's kites and flushed others down the toilet.  (*Id.* at

334.)  Walters acknowledged that he was present at trial because he had been subpoenaed.  He hoped

for some benefit in his case as the result of his testimony, though he had been promised nothing.

(*Id.* at 334-35.)  Walters identified a number of kites, including People's proposed exhibits 6, 7, 8,

9, 10 and 12.  (*Id.* at 335-36.)  According to Walters, exhibit 6 was passed under his door by

Petitioner.  (*Id.* at 336.)  From the content of the exhibit, Walters knew that the kite was supposed

to go to someone else, but that Walters was supposed to rewrite it so that it would not be in

Petitioner's handwriting.  (*Id.* at 338.)  Walters read the text aloud:

> A.   What's good, Tez, bitch?  That's some ho-ass shit that they got you in here.
> Man, I was on some bullshit when that ho-ass shit happened, but I told your
> little brother that I would look out for you and your baby mama when I get
> out.  Like I was letting your brother know, man, I know y'all.  I mean, I knew
> y'all for too long.  Man, Tez, they trying to give me 15 years for that shit and
> my baby only one.  She will be 16 years old when I get out.  Tez, I can't do
> that time.  All I need for you to do is tell them in my trial date is you had a
> mistake.  It was someone else that looked like me that gave Walker the gun
> and you thought it was me, 'cause that is what people was telling you.  But
> [Petitioner] didn't never have a gun and your baby mama can say that.  It was
> a boy that looked like me because she saw the boy who did it in the store and
> know it was the boy by the five point star on his hand.

(*Id.* at 338-39.)  Walters testified that he knew that he was supposed to rewrite the kite and pass it

along to Tez (Anthony Brown), but he did not do so.  (*Id.* at 339, 342.)  Walters was aware that Tez

was a victim in the case.  (*Id.* at 342-43.)  Walters testified that exhibits 7, 8, 9 and 10 were not

written by Petitioner but had been rewritten by others.  (*Id.* at 340.)  He never directly talked to

Petitioner about the kites, but Petitioner sometimes told him what was going on and who was going

to testify and what they were saying.  (*Id.* at 342.)

Benton Harbor Police Detective Wes Smigielski testified that he knew about the case

by February 2, 2009, but he became involved in the case on February 3, 2009, when he participated

in the interview of Demarcus Walker, who had turned himself in.  (*Id.* at 345-46.)  Before the interview, he knew that the suspects were Demarcus Walker, Dominique Blackwell, Norris Maben and Petitioner.  As a detective he was aware that Petitioner's street name was Little Mooda, Maben's was No-No, and Blackwell's was Domino.  (*Id.* at 346.)  After interviewing Walker, Smigielski re-interviewed Andrea Cole and Anthony Brown, and he attempted to find out who Chris was.  (*Id.* at 346.)  He managed to identify Chris on about July 15, 2009, after he received some kites from the jail, and he interviewed Chris White on July 17, 2009.  (*Id.* at 347-48.)  He also talked to Keenan Watkins on February 5, 2009.  (*Id.* at 348.)  When Smigielski spoke with Watkins, Watkins had no memory problems, was willing to talk with him, and gave him details of the robbery.  (*Id.* at 348-49.)  Smigielski later got a tip about Norris Maben's location, and police arrested Maben and Petitioner at the same time at the home of one of their family members.  Maben, Doss and a third person did not come out of the house for over an hour after multiple police officers had announced their presence.  (*Id.* at 349-51.)  When they searched the house, they found three cartridges in the attic, one with a .32 caliber bullet and the other with a .22 caliber bullet.  (*Id.* at 352-53.)  They did not find a gun.  (*Id.* at 354.)  Smigielski interviewed Norris Maben, who talked to him about the robbery.  Maben told Smigielski that Petitioner patted down both Watkins and Brown.  (*Id.*)  Maben also told Smigielski that Petitioner told Maben to help him, but Maben refused.  Further, Maben told him that Petitioner had the purse in the front seat of the car as they left the robbery.  (*Id.* at 355.)  After they arrived at Maben's aunt's house, Petitioner threw the purse into a snowbank, and all of the men went their separate ways.  (*Id.*)  Smiegielski testified that he made many attempts to locate Dominique Blackwell, including going to his house multiple times, talking with his sister, talking with his parole agent, and getting the agent to have him report early for his parole appointment.  (*Id.*

at 356.)  The prosecutor asked Smigielski to testify about his familiarity with the term "good looking when you get out" or "good looking out," as used in the jail kite.  Smigielski testified that the terms meant that the individuals would look out for each other.  "I got you" means that someone will back him up.  (*Id.* at 357.)

After a break in the proceedings, Demarcus Walker, age 19, agreed to testify pursuant to a plea agreement.  (*Id.* at 364-65.)  Walker testified that he had known Petitioner for a couple of years.  (*Id.* at 367.)  Prior to the robbery, he also knew Anthony Brown and Keenan Watkins, but not Andrea Cole.  (*Id.* at 368.)  On February 1, 2009, Walker, Norris Maben, Dominque Blackwell and Petitioner drove in an IROC to the house where Watkins, Brown and Cole lived.  (*Id.* at 369-70.)  While they were driving over to the house, Petitioner mentioned that Watkins had just won some money in a dice game the night before.  (*Id.* at 382.)  At the house, the men were relaxing for awhile, smoking marijuana.  (*Id.* at 370, 390, 393.)  Petitioner then pulled a gun from his coat and ordered Watkins to get down on the couch and Brown to turn over.  (*Id.* at 370.)  Walker had not seen the gun before Petitioner pulled it out.  He identified the gun as a small, black revolver.  (*Id.* at 371.)  Plaintiff kept asking where the money was.  (*Id.* at 371-72.)  Watkins and Brown responded that they had no money.  (*Id.* at 372.)  Petitioner told Walker to "go grab the girl."  (*Id.* at 370.)  Walker started up the stairs, but he came back down and told Petitioner that he couldn't do it.  (*Id.*)  Petitioner handed Walker the gun and told him to hold it while Petitioner went upstairs to get the woman.  (*Id.*)  Petitioner told Walker not to let Brown and Watkins get up.  (*Id.* at 374.)  Brown asked Walker to let him go get Cole, but Walker told Brown not to get up.  (*Id.* at 375.)  Chris left the house when Petitioner was still upstairs.  (*Id.* at 378.)  When Petitioner came back downstairs, the woman was with him.  (*Id.* at 375.)  The woman began telling Walker that she was his cousin.

(*Id.* at 376.)   Petitioner grabbed the purse shortly thereafter, and Walker left the house without saying anything.  (*Id.* at 376-77.)  When they got outside, Walker gave the gun back to Petitioner. (*Id.* at 378.)  Walker, Maben, Blackwell and Petitioner all got into the car and drove over near the bridge by McCord Street, where they dropped the car.  (*Id.* at 379.)  During the ride, Petitioner looking into the purse.  (*Id.* at 380.)  After they parked the car, they ran away together for awhile, before splitting up.  Walker testified that he went home and that he did not see what happened to the purse.  (*Id.* at 379-80.)  Walker turned himself into the police a couple of days later because, despite the fact that he took part in the crime, it was wrong.  (*Id.* at 382.)  Under Walker's plea agreement, he pleaded guilty to unarmed robbery, in exchange for dismissal of the armed robbery charge and an agreement not to be charged with possession of a firearm during the commission of a felony.  (*Id.* at 383.)  Regardless of his plea deal, Walker knew that he was going to prison.  (*Id.* at 384.)  After Walker had agreed to testify in the case, he spoke with Petitioner in the jail, and Petitioner threatened to hit him in the face.  (*Id.* at 384-85.)  While they were waiting in the holding cell during court proceedings, Walker told Petitioner that he had made a statement.  (*Id.* at 385-86.)  Petitioner stated, "Oh, man.  That's who they got on me . . . ."  Petitioner made no threats at that time.  (*Id.* at 386.)

Berrien County Sheriff's Deputy Kevin Green testified that he worked at the Berrien County Jail.  On April 6, 2009, Green was working in central control, where he observed the video feeds from the jail cameras.  (*Id.* at 395-96.)  He saw a jail trustee (inmate worker) with a note under his commissary items walk toward the gym.  (*Id.* at 396-97.)  Because prisoners were not supposed to pass things, he turned the speaker and camera on at the location of the trustee.  He heard the trustee, Jerry Scott, tell someone to put the items under Anthony Brown's bed, saying, "This is for

Anthony Brown from Justin Doss." (*Id.* at 396-97.) He saw Scott pass a honey bun and chips to an individual in the gym, and he watched to see the bed to which the items were delivered. (*Id.* at 398.) He saw inmate Donald Adams take the items and place them under Brown's bunk. (*Id.* at 402.) Green called for the first floor deputy, Brent Galloro. Galloro and Deputy Scott Kuhl arrived. (*Id.* at 399.) Green told the deputies where the items had been placed, and they handled the subsequent discipline. (*Id.* at 400.) According to Green, the commissary items delivered for Brown were frequently used as a form of payment. (*Id.* at 401.)

Jerry Scott testified that he was a jail trustee at the Berrien County Jail on April 9, 2009. (*Id.* at 404.) As a trustee, Scott had some additional freedoms. He testified that sometimes things get passed between inmates, even though such exchanges were not allowed under jail policy. (*Id.*) Scott identified Petitioner and testified that Petitioner was in jail in April 2009. (*Id.* at 405.) At some point in time, he was asked by Petitioner to pass a honey bun and some snacks to Tez. (*Id.* at 406.) Scott delivered the commissary items to the gym and passed them to someone through the food slot in the door. (*Id.* at 407-08.) Scott did not see the man who took the items, and he just continued to push his cart past the door. (*Id.* at 408.)

Donald Adams testified that, in April 2009, he went to the food slot, where a man told him to put a honey bun and some chips on Tez's bunk. (*Id.* at 412-14.) There was a note with the items, and Adams put the items on the indicated bunk. (*Id.* at 413.) After he did as asked, Adams talked to the deputies, because prisoners were not supposed to pass items. (*Id.*) He did not read the note, but he saw that it was written on ordinary jail paper obtained from the commissary. (*Id.* at 415.)

On the morning of the third day of trial, the prosecutor notified the court that Dominique Blackwell had been arrested and therefore would be testifying. (Tr. III at 429.) Berrien County Sheriff's Deputy Edward Scott Kuhl testified that he worked in the jail.  On April 6, 2009, he assisted Deputy Galloro in responding to a call issued by Deputy Green from central control.  (*Id.* at 431.)  Green reported that one of the trustees had just passed a note and some food items into the gym, and he asked Galloro and Kuhl to check it out.  (*Id.* at 432.)  Kuhl and Galloro went into the gym and followed Green's directions to the bunk, and Kuhl saw the note and a honey bun and chips were under the bunk.  (*Id.* at 432-33.)  Kuhl picked up the note.  When he saw the name "Tez," he asked an older inmate who that was.  The inmate told him that Tez was Anthony Brown.  (*Id.* at 433.)  Kuhl made a photocopy of the note and sent it to the prosecutor's office.  (*Id.* at 434.)  Kuhl identified Exhibit 13 as the note he found under the bed.  (*Id.* at 434-35.)  Kuhl read the note for the jury:

> A.    . . . Was good Tez bitch.  Me shit stressing bro, you know, that some ho-ass shit they got you in here.  Man I was on some bullshit when that ho-ass shit happened but I told little brother that I would look out for you and your baby mama when I get out ASAP like I was telling your little brother.  Man I know you all for too long.  Man Tez, they trying to give me 15 years for that shit.  My daughter's [] only one.  That means she will be 16 when I come home.  Tez, I can't do that time, know what I mean, for it was – it's – I'm sorry – I mean, if it was you I would look out for you just 'cause we know each other for so long and I was just in a different zone.  All I need is for you and your BM to come to my trial date and say that someone looked like me gave Walker the gun but it wasn't [Petitioner].  He never had a gun in my presence.  And you – and you BM can say that the dude had a five-point star on his hand and she know who it is because she seen the guy in the store recently and he was even acting suspicious when they made eye contact.  And [Petitioner] never took the purse.  And we are sorry for choosing the wrong man but they look very similar to us.  And we were drinking or anything.  And they will have to let me go if you and your BM say that.  And then no one will get in some shit for as you all making the new statement that way and say you all is sorry for choosing the wrong man and real shit.  I will look out for you all as soon as I get out these doors.  You can send this home

in a letter and she will know exactly what to say in court.  and if – and if you
need some stamps I got some, just hit me back.  If you don't do it for me, do
it for my daughter and fam.  This just some real negative shit.  Real negatives
do real things, bro.  WB and let me know what's going on, bro one, WB
ASAP LSB-488.

(*Id.* at 435-36.)

Dominique Blackwell testified that he had known Petitioner for a long time.  (*Id.* at
440.)  He had known Anthony Brown by sight for a couple of years.  He also knew Keenan Watkins
for the same period, but Watkins was not a friend.  He did not know Andrea Cole.   (*Id.* at 441.)
Brown acknowledged that he was arrested the day before he testified, but he denied knowing that
the police had been looking for him to serve him a subpoena.  (*Id.* at 442.)  He admitted that he was
aware that he had information relevant to the case.  (*Id.* at 443.)  Blackwell went to Anthony
Brown's house in the Buss projects on only one occasion, in February 2009, in the company of
Norris Maben and Petitioner.  Blackwell denied that Demarcus Walker was with them.  (*Id.* at 444-
45.)  Blackwell believed that a dice game was going on at the address.  They drove over in Maben's
car.  (*Id.* at 445.)  Brown and Watkins were present, but Blackwell did not see a female and did not
see another man.  (*Id.* at 446.)  Blackwell testified that the only thing that happened that night was
a dice game.  He denied that he had seen a gun pulled or than anything else had happened, though
he claimed to have been intoxicated part of the time.  (*Id.* at 446-47.)  Blackwell testified that he
heard about the robbery, but he did not believe it because he was there.  (*Id.* at 448.)  He denied ever
talking to the police about the incident or about having been in the apartment at the time of the
robbery, about leaving with Maben, about Petitioner having the purse, or any other specific fact.
(*Id.* at 448-52.)

Detective Smigielski was recalled to the stand.  He testified again as to his attempts to serve a subpoena on Blackwell.  He testified that he had made arrangements to have Blackwell report to a known location earlier in the week, but Blackwell did not come.  (*Id.* at 545-55.) Blackwell was arrested between 3:00 and 4:00 p.m. the day before his testimony was given. Smigielski testified that he spoke with Blackwell on March 27, 2009.  (*Id.* at 455.)  Blackwell told Smigielski that he, Maben, Walker and Petitioner went to Anthony Brown's house to play dice. When they arrived, Blackwell sat by the back door with Maben and witnessed Petitioner pull out a handgun.  Blackwell told Smigielski that he and Maben went out the door and did not see anything after that.  He got into the back seat of Maben's car with Walker.  Petitioner came out with a white purse in his hand.  They then went over to Maben's house, where Maben parked.  They then went their separate ways.  (*Id.* at 456-57.)

Before resting her case, the prosecutor introduced a certified copy of Petitioner's judgment of conviction for carrying a concealed weapon, and the court took judicial notice that the crime was a felony under Michigan law.  (*Id.* at 457.)  After the prosecution rested, the jury was led out of the courtroom.  (*Id.* at 459.)  Defense counsel indicated that Petitioner had elected not to testify, and the court inquired into the voluntariness of his waiver of that right.  (*Id.* at 459-60.) Petitioner also advised that he wished to have the court instruct the jury that his silence could not be used as evidence of guilt.  (*Id.* at 461.)

At the conclusion of trial, on July 24, 2009, the jury found Petitioner guilty of all charges, except the charge of interference with a telecommunications device.  (Tr. III at 517-18.) On September 4, 2009, Petitioner was sentenced to 20 to 50 years' imprisonment for the armed robbery and for each of the assault-with-intent-to-rob-while-armed convictions, 3 years and 7

months to 10 years' imprisonment for the felon-in-possession and carrying-concealed convictions, 2 years' imprisonment for each felony-firearm conviction, and 36 to 96 months' imprisonment for the assault-with-a-dangerous-weapon conviction.  (Sentencing Transcript, (S. Tr.) at 16-19. docket #14.)

### B.      Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on July 5, 2010, raised the same three issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #15.)   Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on August 3, 2010  (*See* 8/3/10 Mich. Ct. App. Ord, docket #15.)  By unpublished opinion issued on March 15, 2011, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 3/15/11 Mich. Ct. App. Opinion (MCOA Op.), docket #15.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered October 5, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #16.)

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA

has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it

- 22 -

decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.  Ineffective Assistance of Counsel

In his first ground for habeas relief, Petitioner contends that his trial attorney was ineffective in failing to impeach two prosecution witnesses, Anthony Brown and Jeremy Scott, with their prior convictions.  He also contends that counsel was ineffective for failing to conduct a more thorough cross-examination of both witnesses.[2]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

---

[2]Petitioner also argues ineffective assistance of counsel as grounds excusing his failure to object to his remaining two grounds for relief.  Those claims will be discussed separately, *infra*.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Expressly applying the *Strickland* standard, the Michigan Court of Appeals denied the issue as follows:

> Doss asserts that his trial counsel was ineffective for failing to impeach two prosecution witnesses, Anthony Brown and Jeremy Scott, with their previous convictions and for the minimal cross-examination conducted with these individuals. To establish the ineffective assistance of his counsel, Doss must demonstrate: (1) that his attorney's performance was deficient because it fell below an objective standard of reasonableness under accepted or prevailing norms and (2) that the deficient performance by his attorney prejudiced his defense.[8] In order to prove that he was prejudiced by counsel's performance, Doss must show that but for the errors of his attorney there is a reasonable probability that the outcome of the proceedings would have been different.[9] Due to the lack of an evidentiary hearing on this matter, our review is limited to errors apparent on the record.[10]
>
> Doss first contends that counsel was ineffective for his failure to impeach these individuals by using their previous convictions because the credibility of witnesses was extremely important in this case. While Brown and Scott did each have a previous conviction that could have been used for impeachment purposes, Doss cannot demonstrate that if his counsel had used the convictions to impeach these witnesses there is a reasonable probability that the outcome of the trial would have been different.[11] When testifying Brown and Scott both acknowledged having been in jail, implying a lack of trustworthiness to the jury without the necessity of

- 25 -

counsel's further input or emphasis. In addition, the testimony of several other witnesses fully comported with Brown's version of the alleged events and Scott's assertion that Doss had given him a note to be delivered to Brown while all three of these individuals were incarcerated. Other testimony also provided evidence of Doss' guilt regarding the charged crimes. While Doss attempts to submit an affidavit from his trial counsel asserting that his election to not impeach these witnesses with their earlier convictions was not a matter of trial strategy, because this document is not part of the lower court record and constitutes an improper expansion of that record, we decline to consider it.[12]

Doss further contends that counsel was ineffective for the cursory cross-examination conducted of these two witnesses. "Decisions regarding what evidence to present and whether to . . . question witnesses are presumed to be matters of trial strategy."[13] Any deficiency or failure to question witnesses constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense.[14] A substantial defense is defined as "one that might have made a difference in the outcome at trial."[15] Counsel's failure to pose questions to Scott may have comprised a tactical decision to minimize references to this individual's contact with Doss in a jail setting and an effort to de-emphasize or shift focus from the efforts by Doss to influence witnesses in this case while in jail. The limited cross-examination conducted with Brown may also have comprised a strategic decision to preclude an opportunity by Brown to repeat or expand on his testimony regarding Doss' involvement in the crimes. Ample evidence was provided by other witnesses that supported Brown's version of the events. Scott's testimony was also supported by other witnesses who observed his interaction with Doss and by the proffer of additional evidence of similar incidents involving Doss attempting to communicate and influence witnesses while in jail. Because sufficient evidence of Doss' guilt existed and further cross-examination of these two witnesses would not have provided Doss with a substantial defense that would have altered the outcome of trial, his assertion of ineffective assistance of counsel for failing to engage in a more protracted cross-examination cannot be sustained.

[8] Strickland v Washington, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); People v Pickens, 446 Mich 298, 302-303; 521 NW2d 797 (1994).

[9] Strickland, 466 US at 694.

[10] People v Scott, 275 Mich App 521, 526; 739 NW2d (2007).

[11] Strickland, 466 US at 694.

[12] MCR 7.210(A)(1); People v Eccles, 260 Mich App 379, 384 n 4; 677 NW2d 76 (2004).

[13] People v Garza, 246 Mich App 251, 255; 631 NW2d 764 (2001).

[14] People v Dixon, 263 Mich App 393, 398; 688 NW2d 308 (2004).

[15] People v. Kelly, 186 Mich App 524, 526; 465 NW2d 569 (1990).

(MCOA Op. at 2-3.)

The state court reasonably concluded that Petitioner could not demonstrate the requisite prejudice from either the impeachment with criminal convictions or more extensive cross-examination.  As the court of appeals recognized, like most of the non-police witnesses in the case, both Anthony Brown and Jeremy Scott already testified that they had been in jail.  Indeed, relevant portions of their evidence were taken from experiences they had in the jail, and both admitted that they were housed in the Berrien County Jail at the same time as Petitioner.  Despite being a victim in the case, Brown's testimony was given reluctantly, and then only because of the threat of jail that Brown faced if he failed to comply with a subpoena.  Brown's testimony was consistent with that of Andrea Cole and consistent in a variety of details with those witnesses who were not actively obstructionist.   Further unspecified cross-examination would have done little except to reinforce the testimony given by Brown.

Similarly, Jeremy Scott's testimony was limited to a description of his own jail-rules violation, committed in passing snack items and a note to Anthony Brown from Petitioner.  The substance of his testimony was supported by evidence given by Brown, Deputies Green and Kuhl, and jail inmate Adams.  No basis exists for concluding that the jury's decision would have been affected in any way by knowing that Scott was not only in jail but also convicted of a criminal offense. Moreover, as with Anthony Brown, cross-examination would only have served to reinforce the damage done by Scott's testimony.

In these circumstances and in the context of the other evidence in the case, no basis exists for concluding that the failure to cross-examine Brown and Scott about their past convictions

or any other fact had an effect on the judgment.  The state court's determination of the claim was entirely reasonable.

> II.   <u>Prosecutorial Misconduct</u>

In his second ground for habeas relief, Petitioner contends that the prosecutor committed prejudicial misconduct when she misspoke during a contentious examination of Keenan Watson.  Specifically, he objects to the prosecutor's one-time use of the word "raped" instead of "robbed."  Petitioner also argues that trial counsel was ineffective in failing to object to the question.[3]

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The Supreme Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so

---

[3]The state court reviewed the issue for plain error, in light of Petitioner's failure to file a contemporaneous objection.  As a result, the issue potentially is procedurally defaulted.  *See Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010) ( "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review.").  Petitioner argues, as he did in the Michigan courts, that the ineffectiveness of counsel excused his failure to object.  The United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

infected the trial as to amount to a violation of due process: (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Michigan Court of Appeals rejected Petitioner's claim, as follows:

Doss further asserts the prosecutor engaged in misconduct by asking an inflammatory question that was not based on the evidence and that failure of his counsel to object to this question constituted ineffective assistance. Because counsel did not object, we review for plain error that affected Doss' substantial rights.[16] A conviction will be overturned only if a plain error affecting substantial rights exists, and it is determined that Doss was actually innocent or if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings."[17] "[W]here a curative instruction would have alleviated any prejudicial effect we will not find error requiring reversal."[18]

Keenan Watkins, a witness and victim of the alleged crimes, repeatedly indicated he could not recall any of the events or his statement to police when questioned by the prosecutor. A reading of the transcript of Watkins' verbal responses, or lack thereof, indicates that he was an uncooperative witness and contumacious in his answers to inquiries by the prosecutor. In an effort to pin Watkins down regarding his memory, the prosecutor queried whether he recalled that his sister-in-law, who was also a victim and present at the time of the alleged crimes, was pregnant when the events occurred. Although Watkins answered in the affirmative that his sister-in-law was pregnant at the time and remained so at the time of the trial, he failed to respond or provide an audible response to several subsequent related questions. When Watkins then asserted that he simply couldn't remember and had "a bad memory," the prosecutor queried:

> So you would – you're telling us that you're not sure if you'd remember if there was [a] gun pulled out in the house and someone raped your pregnant sister-in-law and held you and your brother at gunpoint on a couch?

Doss asserts it was misconduct for the prosecutor to indicate that one of the victims of the robbery was raped when there had been no such allegation or evidence and was highly prejudicial.  As this is the only such reference or use of the term "raped" in the entire trial and given the context of the questioning and the obvious frustration of the prosecutor with this witness, a more plausible explanation would be that the prosecutor simply misspoke when he used the term.  Based on the facts of the case, the context of the question, the one-time use of the term and the lack of any response or reaction by the trial court or defense counsel it would seem more probable that it was understood that the prosecutor intended to say "robbed" rather than "raped."  To suggest, as does Doss, that this one reference or use of the term while questioning an extremely recalcitrant witness was an attempt by the prosecutor to improperly prejudice the jury is mere hyperbole.  Doss was not charged with any criminal sexual conduct, there was no argument or any other suggestion that he had engaged in such actions during the criminal events.  The pregnant victim was robbed as her purse was taken from her and removed from the scene by Doss and his cohorts.  To suggest that this single, clearly inadvertent reference was sufficient to compromise or confuse the jury is ludicrous given the plethora of testimony received on the actual charges Doss faced.  Because jurors are presumed to follow their instructions[19] and the trial court did instruct the jury that questions, comments and argument by the attorneys was not evidence and that they could only consider "evidence that has been properly admitted" in reaching their verdict, any potential for prejudice by this isolated misstatement was precluded.  Concomitantly, as there is no reasonable probability that the outcome of this trial would have been different but for the failure of Doss' trial counsel to object to this statement, his claim of ineffective assistance of counsel cannot be sustained.

[15] *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990).

[16] *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004).

[17] *People v Ackerman*, 257 Mich App 434, 448-449; 669 NW2d 818 (2003).

[18] *Id.* at 449 (citation omitted).

[19] *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).

(MCOA Op. at 3-4.)

The decision of the state court is both factually and legally reasonable.  The court of appeals concluded that, on the record of the case, the mis-use of the word "raped" was inadvertent.

As I previously discussed, a determination of a factual issue made by a state court – including a state appellate court – is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546; *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner makes no serious effort to contest that finding.  He merely hypothesizes that the prosecutor must have intended the error. Petitioner's hypothesis is wholly unsupported by the record.  As a consequence, in the absence of evidence to the contrary, the court of appeals' conclusion that the statement was not intentional was factually  reasonable.

Moreover, the isolated erroneous use of a word in the course of a spirited effort to challenge a contumacious witness falls far short of demonstrating any reasonable possibility that the jury could have been misled.  Petitioner was not charged with a sexual assault, and no evidence or argument was presented at trial on that issue.  Instead, strong evidence was introduced to support the jury's findings that the pregnant victim was robbed, while two other men were held at gunpoint during an attempted robbery.  Further, the jury was instructed that the questions and statements of the attorneys were not evidence.  (Tr. III at 493.)

In sum, the factors identified by the Supreme Court all cut against Petitioner's claim of prosecutorial misconduct.  *See Darden*, 477 U.S. at 182-83; *Young*, 470 U.S. at 12-13.  The state court's denial of relief on this ground therefore constituted a reasonable application of established Supreme Court precedent.

III.     Sentence Scoring Errors

In his third ground for habeas relief, Petitioner contends that the trial court improperly calculated two offense variables, OV 3 and OV 13.   Recognizing that no contemporaneous objection was made, Petitioner also argues that counsel was ineffective in failing to object to the sentence scoring.

Despite the attorney's failure to object at trial, the court of appeals addressed Petitioner's sentencing claims on the merits:

Finally, Doss asserts two scoring errors in his sentencing regarding offense variables (OVs) 3 and 13.[20]  This Court reviews the interpretation and application of the statutory sentencing guidelines de novo.[21]  "A sentencing court has discretion in determining the number of points to be scored [when calculating the sentencing guidelines], provided that evidence of record adequately supports a particular score."[22]  We review preserved scoring issues to determine if the sentencing "court properly exercised its discretion and whether the evidence adequately supports a particular score."[23]  "Scoring decisions for which there is any evidence in support will be upheld."[24]

Doss contends the trial court abused its discretion when scoring five points for "physical injury to [a] victim" under OV 3.[25]  Specifically, five points are to be scored if "[b]odily injury not requiring medical treatment occurred to a victim."[26] The trial court determined that five points were appropriately assigned under OV 3 because one of the victims during the robbery was struck in the back of the head with a handgun.  Although the victim was not rendered unconscious and the victim discounted the force of the impact, it was reasonable for the trial court to infer that a bodily injury was incurred, even if any such injury was minimal.  Because the evidence supports the trial court's scoring of OV 3, we are compelled to uphold the trial court's scoring of this variable.[27]  We note without deciding so, merely as an aside, that even if we were to find that this variable was improperly scored resentencing would not be required as the guidelines range would remain unchanged.[28]  Doss' second contention of error regarding scoring of the sentencing guidelines involves the assignment of 25 points for a "continuing pattern of criminal behavior" under OV 13.[29]  Specifically, 25 points are to be scored when "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person."[30]   The statute requires that "[f]or determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction."[31]  "[O]nly those crimes committed during a five-year period that

- 32 -

encompasses the sentencing offense can be considered."[32]  Contrary to Doss' argument, the plain language of the statute[33] indicates that a sentencing court must include all contemporaneous crimes.[34]  Because Doss was convicted of assault with a dangerous weapon and two counts of assault with intent to rob while armed in addition to his conviction for armed robbery, there existed a sufficient basis for the trial court's assignment of 25 points on this variable to satisfy the statutory requirement that "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person."[35]  Doss' contention that we should convene a conflict panel based on his citation to unpublished cases is without merit as we are bound by the published authority that supports our conclusion in this case.[36]

Doss again asserts that trial counsel was ineffective for failing to object to the scoring of OV 3 and OV 13.  Having found no error by the trial court in the scoring of these variables, his contention of ineffective assistance of counsel is not viable.[37]

[19] *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).
[20] MCL 777.33; MCL 777.43.
[21] *People v Cannon*, 481 Mich 152, 156; 749 NW2d 257 (2008).
[22] *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002).
[23] *People v Steele*, 283 Mich App 472, 490; 769 NW2d 256 (2009) (citation omitted).
[24] *People v Endres*, 269 Mich App 414, 417; 711 NW2d 398 (2006).
[25] MCL 777.33.
[26] MCL 777.33(1)(e).
[27] *Endres*, 269 Mich App at 417.
[28] *People v Francisco*, 474 Mich 82, 89 n 8; 777 NW2d 44 (2006).
[29] MCL 777.43.
[30] MCL 777.43(1)(c).
[31] MCL 777.43(2)(a).
[32] *Francisco*, 474 Mich at 86.
[33] MCL 777.43(2)(a).
[34] See *People v Harmon*, 248 Mich App 522, 532; 640 NW2d 314 (2001).
[35] MCL 777.43(1)(c).
[36] MCR 7.215(J)(1).
[37] *People v Davenport*, 286 Mich App 191, 199; 779 NW2d 257 (2009).

(MCOA Op. at 4-6.)

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS

CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Claims concerning the improper application of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief).

Here, Petitioner raised only a state-law sentencing claim. The Michigan Court of Appeals conclusively determined that the trial court had properly applied Michigan law in calculating the sentencing guidelines. The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

Moreover, because the Michigan courts held that the guidelines were correctly scored, Petitioner cannot demonstrate that his attorney was ineffective in failing to object. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

For both reasons, Petitioner fails to raise a meritorious federal claim.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  May 4, 2015                                    /s/ Hugh W. Brenneman, Jr.
                                                       HUGH W. BRENNEMAN, JR.
                                                       United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).